Donald EVERETTE, Petitioner–Appellee,

v.

Thomas P. ROTH, Warden, Sheridan Correctional Center, and Roland W. Burris, Attorney General of the State of Illinois, Respondents–Appellants.

No. 92–4063.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1993 *. ·

Decided Sept. 23, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied Nov. 30, 1994.

Glenn E. Heilizer (argued), B. Franco Laterza, Laterza & Heilizer, Chicago, IL, for petitioner-appellee.

Terence M. Madsen, Asst. Atty. Gen., Thomas L. Ciecko, Deputy Atty. Gen., Steven J. Zick (argued), Office of Atty. Gen., Crim. Appeals Div., Chicago, IL, for respondents-appellants.

Before FAIRCHILD, COFFEY and RIPPLE, Circuit Judges.

FAIRCHILD, Senior Circuit Judge.

Petitioner-appellee Donald Everette ("Everette") was convicted of murder in Illinois state court following a jury trial. Everette contends that the trial court improperly refused to instruct his jury on self-defense and voluntary manslaughter in violation of his federal due process rights. Thomas Roth, the Warden of Sheridan Correctional Center where Everette is incarcerated, and Roland Burris, the Attorney General of Illinois, appeal from a judgment of the district court granting Everette's petition for a writ of habeas corpus.[1] We reverse.

---

* This case was briefed separately but argued together with *Green v. Peters,* No. 92–2856 [36 F.3d 602]; *Carter v. DeTella,* No. 92–2978 [36 F.3d 1385]; *Cuevas v. Washington,* No. 92–3090 [36 F.3d 612]; and *Rosa v. Peters,* No. 92–3258 [36 F.3d 625].

1. Because the Illinois Attorney General represents Mr. Roth, we will refer to respondents-appellants collectively as "the State."

## I. BACKGROUND

### A. Facts

Edward Jeffries ("Jeffries") testified that on November 1, 1985, he left his mother's apartment around 10:00 p.m. In the apartment building's breezeway, he ran into a friend, Johnny Island ("Island"), and another man ("Donnell"). The three men decided to go buy some beer. They returned to the apartment building, and stood by a row of mailboxes (about twenty feet long), which are outside the breezeway.

As the men were talking and drinking, Everette approached the mailboxes. Jeffries and Donnell teased Island about a prior incident between Island and Everette, telling Island he had "better move." Island went to the other side of the mailboxes, away from Everette. Everette said he could get Island if he wanted to; Island responded that he was not scared of Everette, and called Everette a name. Everette then left.

Jeffries testified that after about five minutes, Everette came down a ramp towards the mailboxes. As he came off the ramp, he started to run towards the three men. Island began to run away from Everette. As Everette ran towards the mailboxes, he pulled out a gun; Island was running away with his back towards Everette. Island stumbled as he was turning to go around the mailboxes, and a shot went off. Everette was seven to ten feet away, with both hands outstretched, pointing the gun at Island. Jeffries asked Everette why he shot Island; Everette said nothing and walked back up the ramp. Jeffries found Island about sixty feet away from the building, lying on his back and not moving.[2] Island died from massive bleeding due to a gunshot wound, eighteen inches from the top of his head and two inches from the middle of his back.

Everette testified that he came home around 10:00 p.m. and went to his mailbox; he heard Jeffries say, "[t]here he is" and Island say, "[w]e aren't going to start nothing, 'cause that is over were [sic]." Tr. at 569. Everette understood him to be referring to an incident of that June, when Everette told Island and some others who were verbally fighting to stop yelling, and Island hit Everette on the head with a soda bottle, causing Everette to fall. As Everette went towards his apartment, the three men attempted to go through his pockets, but did not get into his pockets.[3] When he was in his apartment, Everette realized that two of the letters he had gotten from his mailbox were not his.

According to Everette's version, he decided to go out for some food a short time later. Because he thought the three men might still be around, he put a gun in the waistband of his pants. He went to his mailbox to return the letters that were not his. As he was closing his mailbox, he heard Island say "[w]hat are you doing back down here?'" Id. at 586. Everette turned in Island's direction, and could only see a silhouette.[4] Island's arm "was in a striking position," and he held what appeared to be a can in his hand.[5] Everette believed Island was going to hit him. Id. at 587. Island was "frantic." Jeffries said "'[h]it him, hit him.'" Id. at 588. Island did not threaten him, except for having his arm in the "striking position."

---

**2.** Another witness testified that he was walking by the building when he heard a shot and then saw Island fall about twenty-five feet from the building.

**3.** A resident of the building testified that she saw Island, who appeared to be drunk, going through Everette's pockets and calling him names. Everette, however, testified that Island never touched him that evening.

**4.** When asked whether he could make out the silhouette's features, Everette said he could not because of the lighting. Everette knew the silhouette was Island because he knew Island's voice.

Everette testified that he told the assistant state's attorney that he could not read the statement he gave at the police department without his reading glasses because he is "legally blind."

Everette is five foot eleven, and weighs around two hundred fifty pounds. By Everette's description, Island was "much smaller" than Everette; Island weighed one hundred forty-one pounds when his autopsy was performed.

**5.** Everette demonstrated what he meant by "striking position" to the jury, which his counsel described for the record as "arm held about a 45-degree angle from the body, hand at waist height and drawn slightly behind the body." Tr. at 587.

Everette testified that he was scared, and took the gun out "because of fear of my life," and cocked it. *Id.* at 656. He pointed the gun in Island's direction; he did not intend to shoot him, but did it to scare Island so Island would leave him alone. As Everette took one step back, he saw Island begin to turn to run away. As Everette took a second step back, his shoulder bumped the mailboxes, which made the gun discharge accidentally.[6] Everette heard a scream, turned around, and went upstairs to Jeffries' mother's apartment, where he gave her the gun.

Everette returned to his apartment and called his brother, who came over. Everette asked him to get a lawyer. His brother asked if he had called the police; when Everette said no, his brother went to phone the police, but the police had just arrived at Everette's door.

In a court-reported statement taken at the police department, with an assistant state's attorney asking Everette questions, the following discussion took place:

[Question:] And after he said, what are you doing back down here, what did you do then?

[Answer:] I looked at the can and I saw that the can was in the position as to strike me, and that's when I took out my revolver.

[Question:] Now you said the can was in a position to strike you. It was not raised above his shoulders, was it?

[Answer:] No, but it was in a position set.

[Question:] Now, he never said he was going to strike you, do he?

[Answer:] No. No.

[Question:] He never swung his arm in an attempt to strike you, did he?

[Answer:] No. No.

. . . .

[Question:] Now, after you saw him standing there with the beer can in his hand, you stated you drew your revolver, is that correct?

[Answer:] That's right.

[Question:] And what did Johnny Island do after that?

[Answer:] He began to walk away.

[Question:] And after he began to walk away, what did you do?

[Answer:] I pulled my revolver.

[Question:] You say you pulled your revolver. Exactly what did you do?

[Answer:] I—

[Question:] Did you fire a shot?

[Answer:] Yes, I did.

*Id.* at 525–526. There is no discussion in Everette's statement that Everette bumped the mailboxes or that the gun discharged accidentally.[7]

### B. Procedural History

The trial judge instructed the jury on murder and involuntary manslaughter,[8] but refused to give instructions on self-defense [9]

6. One detective who initially met with Everette after he was arrested testified that Everette, when describing what happened, did not tell him that he bumped into the mailboxes or that the gun discharged accidentally. Everette did tell the detective that he was afraid and fired the gun in self-defense. And, during a conversation when the detective was present and an assistant state's attorney was questioning Everette (but before his court-reported statement was taken) Everette did not tell them that he bumped into the mailboxes or that the gun discharged accidentally.

Additionally, one of the arresting officers testified that shortly after Everette was arrested and given his rights, he discussed the incident with the police in a squad car, but said nothing about bumping the mailboxes or the gun discharging accidentally.

7. Everette testified that his statement does not reflect that he backed into the mailboxes because the assistant state's attorney interrupted him as he was about to give that answer.

8. Under the relevant section of the Illinois Code [a] person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly. . . .
Ill.Ann.Stat. ch. 38, para. 9–3(a).

9. Under the relevant section of the Illinois Code (a) person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such

and voluntary manslaughter based on an unreasonable belief that circumstances existed which would have justified the killing.[10] The judge felt that because Everette testified that he did not intentionally fire the gun, the instructions on self-defense and voluntary manslaughter were precluded. The jury convicted Everette of murder. The Illinois Appellate Court reversed Everette's conviction, finding that Everette's claim of the gun's accidental discharge did not preclude an instruction on self-defense, that the jury should have been instructed on self-defense and voluntary manslaughter, and that the error was not harmless. *People v. Everette*, 187 Ill. App.3d 1063, 135 Ill.Dec. 472, 543 N.E.2d 1040 (1989). The Illinois Supreme Court reversed, finding that there was insufficient evidence to so instruct. *People v. Everette*, 141 Ill.2d 147, 152 Ill.Dec. 377, 565 N.E.2d 1295 (1990). Everette filed a Petition for Rehearing, which the court denied.

Subsequently, Everette filed a petition for a writ of habeas corpus in federal district court. The district court granted Everette's petition, finding there was sufficient evidence to instruct the jury on self-defense and voluntary manslaughter. This appeal followed.

## II. DISCUSSION

### A. Fair Presentment

In *United States ex rel. Spurlark v. Wolff*, 699 F.2d 354 (7th Cir.1983), this court held

that a state prisoner seeking habeas relief is barred from raising a claim he had failed to raise on a state court appeal, unless he can show cause and prejudice. *See Murray v. Carrier*, 477 U.S. 478, 489–490, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986). A petitioner's claim "must have been presented in such a way as to fairly alert the state court to any applicable [federal] constitutional grounds for the claim." *United States ex rel. Sullivan v. Fairman*, 731 F.2d 450, 453 (7th Cir.1984).[11]

Earlier, in the context of exhaustion of state remedies, the Supreme Court had said that "the federal claim must be fairly presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). "[W]e do not imply that respondent could have raised ... [his federal constitutional] claim only by citing 'book and verse on the federal constitution.' ... [citations omitted] We simply hold that the substance of a federal habeas corpus claim must first be presented to the state courts." *Id.* at 278, 92 S.Ct. at 513.

The State argues that Everette did not fairly present to the Illinois Supreme Court his claim that the trial court's failure to instruct on self-defense and voluntary manslaughter violated his federal constitutional rights.[12]

---

other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. Ill.Ann.Stat. ch. 38, para. 7–1. The Illinois Pattern Jury Instruction on self-defense follows the statutory language. Ill. Pattern Jury Instructions, Criminal IPI, No. 24–25.06 ("Use of Force in Defense of a Person") (2d ed. 1981).

10. Under the relevant section of the Illinois Code

[a] person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [Justifiable Use of Force; Exoneration] [footnote omitted], but his belief is unreasonable.

Ill.Ann.Stat. ch. 38, para. 9–2(b).

11. In *Sullivan*, this court concluded that petitioner waived his right to submit his due process claim in federal court because he did not present his due process argument to the state courts in the context of a federal constitutional claim, he never used the language "due process," he relied on state cases which refer only to the "interests of justice," and the state appellate court opinion indicated that it discerned no due process implications.

For a list of factors to consider in determining whether a petitioner has fairly presented a federal claim, *see Sullivan*, 731 F.2d at 454 (including n. 9).

12. Everette's brief to the Illinois Appellate Court is not contained in the record, and neither party discusses it. While submitting a new claim to a state's highest court in a petition for discretionary review does not constitute fair presentment, this rule does not apply if a state court has actually ruled on the matter. *Castille v. Peoples*, 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989). Additionally, neither party

In his brief to the Illinois Supreme Court, Everette argued that his right to an instruction on self-defense was not precluded as a matter of law although there was evidence of accidental homicide. In addition to citations to numerous Illinois cases, Everette cited to *Mathews v. United States,* 485 U.S. 58, 64, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988), in which the Supreme Court noted that "state cases support the proposition that a homicide defendant may be entitled to an instruction on both accident and self-defense, two inconsistent affirmative defenses."

The Illinois Supreme Court may have discerned a constitutional nature in Everette's claims; it did cite to two federal cases (one of them a habeas case) for the proposition that a defendant may be entitled to an instruction on self-defense.[13]

■ Everette remarks that he made his federal constitutional claim "more explicit" in his Petition for Rehearing to the Illinois Supreme Court.[14] If we were to conclude that Everette did not present his federal claim until this time, his claim would be waived. *See Cruz v. Warden of Dwight Correctional Center,* 907 F.2d 665, 669 (7th Cir.1990) (petition for rehearing to a state appellate court fails to constitute fair presentment) and *Verdin v. O'Leary,* 972 F.2d 1467, 1479 n. 13 (7th Cir.1992) (citing *Cruz* ).

We need not, however, determine whether Everette adequately presented his federal claim on direct appeal, given the following discussion.

**B.  Failure to Instruct** [15]

■ When there is evidentiary support for a defendant's theory of self-defense, failure to instruct on self-defense violates a criminal defendant's Fifth and Sixth Amendment rights. *Whipple v. Duckworth,* 957 F.2d 418, 423 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 218, 121 L.Ed.2d 157 (1992). Failure to instruct on voluntary manslaughter violates federal due process only if the failure results in a "fundamental miscarriage of justice." *See United States ex rel. Peery v. Sielaff,* 615 F.2d 402, 404 (7th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980); *Taylor v. Gilmore,* 954 F.2d 441, 451 (7th Cir.1992) (noting that "[a] miscarriage [of justice] occurs 'if *credible* evidence in the record would support a verdict based on [the omitted] instruction.' " (citations omitted)), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993), *on remand,* 4 F.3d 997 (1993) (Table); *United States ex rel. Bacon v. DeRobertis,* 728 F.2d 874, 875, *cert. denied,* 469 U.S. 840, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984); *Sanders v. Israel,* 717 F.2d 422, 425 (7th Cir.1983), *cert. denied,* 465 U.S. 1033, 104 S.Ct. 1302, 79 L.Ed.2d 701 (1984); *Davis v. Greer,* 675 F.2d 141, 145 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982).[16]

■ The jury must have found that the gun did not fire accidentally. Assuming that Everette fired the gun with intent to do great bodily harm or kill, we, like the Illinois Supreme Court, find no evidence that he did so because he believed, reasonably or unrea-

---

discusses the implications of the fact that the State, and not Everette, petitioned the Illinois Supreme Court for review.

**13.** We note that while Everette argues that the Illinois Supreme Court did discuss his constitutional claim in its opinion, he also asserts that his petition for rehearing was "to remind the Illinois Supreme Court that it may have 'overlooked or misapprehended' the constitutional basis for Everette's claims...." Everette's Br. at 21.

**14.** Everette's petition stated that "[d]enying self-defense and voluntary manslaughter instructions under these facts would violate Mr. Everette's fundamental constitutional rights under the Sixth and Fourteenth Amendments." Everette's Pet. for Reh'g at 24.

**15.** In this court, Everette argues for the first time that the trial court erroneously omitted the "without lawful justification" element of murder when it instructed the jury. This issue has been waived. *Drake v. Clark,* 14 F.3d 351, 355 (7th Cir.1994).

**16.** Decisions in federal criminal cases have held that a defendant may be entitled to instructions on inconsistent defenses. *See United States v. Browner,* 889 F.2d 549, 555 (5th Cir.1989) and *United States v. Fay,* 668 F.2d 375, 378 (8th Cir.1981); *cf. Mathews v. United States,* 485 U.S. 58, 63–64, 108 S.Ct. 883, 886–87 (1988).

sonably, that firing it was "necessary to prevent imminent death or great bodily harm to himself" from a man who, even by Everette's own testimony, was turning to run away. In any event, if some reasonable inference from the evidence has escaped us, any error in not instructing on self-defense and voluntary manslaughter was harmless.

The Supreme Court has decided that "the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type." *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).[17] There must be more than "a ' "reasonable possibility" ' that trial error contributed to the verdict"; habeas petitioners are entitled to habeas relief based on trial error only if the error resulted in "actual prejudice." *Id.* —— U.S. at —— - ——, 113 S.Ct. at 1721–22. The question is whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* —— U.S. at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

Everette's version of the incident is that he heard Jeffries say "hit him," Island had an object in his hand, and Island's arm was in "striking position." Everette was scared and believed that Island was about to hit him. Everette was also afraid because three months earlier, Island had hit him on the head with a soda bottle.

Everette also testified, however, that when he went to his mailbox the first time, he heard Island say they were not going to start anything. Island did not touch Everette that evening. Everette himself described Island

as turning to run as Everette took his first step backward.

There are indeed some questions of credibility in deciding the correct version of the facts. We do note that the jury must have found Everette's version incredible in large part because it rejected the claim that the gun discharged accidentally. Insofar as possible the habeas or appellate court shuns resolving credibility and weighing the evidence. Nevertheless, the *Brecht–Kotteakos* test for harmless error requires the habeas court to evaluate to some extent the probability of the outcome if the case were tried under proper instructions.

Our review of the trial transcript satisfies us that even if given an instruction on self-defense and voluntary manslaughter, the jury would not have been persuaded that Everette believed (either reasonably or unreasonably) that his conduct was "necessary to prevent imminent death or great bodily harm to himself."[18] Therefore we deem the error, if any, harmless.

Accordingly, the judgment of the district court is REVERSED.

RIPPLE, Circuit Judge, dissenting.

While I believe both questions are close ones, it appears that the district court correctly concluded that the federal issue was presented adequately to the state courts and that there is sufficient evidence in the record to require that a voluntary manslaughter instruction be given. Because I believe that the evidence supported an instruction on voluntary manslaughter, I cannot join my colleagues in reversing the judgment of the

**17.** While the issue in *Brecht* was whether a habeas petitioner was entitled to relief because the state improperly used his post-*Miranda* silence for impeachment purposes, the harmless error standard announced in *Brecht* applies to instructional error. *See Libby v. Duval,* 19 F.3d 733, 739–740 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 314, 130 L.Ed.2d 277 (1994); *Kontakis v. Beyer,* 19 F.3d 110, 116 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 215, 130 L.Ed.2d 143 (1994); *O'Neal v. Morris,* 3 F.3d 143, 145–47 (6th Cir.1993), *cert. granted in part,* —— U.S. ——, 114 S.Ct. 1396, 128 L.Ed.2d 70 (1994) (question presented: "Does state have

burden of proving constitutional error to be harmless under *Brecht v. Abrahamson*?" 62 U.S.L.W. 3680). *But see Suniga v. Bunnell,* 998 F.2d 664, 667 (9th Cir.1993).

Prior to *Brecht,* the harmless error standard was whether federal constitutional error "was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We apply *Brecht* here. *See Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

**18.** The Illinois Supreme Court also found that the instructional error was harmless.

district court. In my view, the majority's conclusion that the error is harmless is based on an impermissible substitution of its judgment on a matter of credibility for that of the state court jury. As the majority quite frankly admits, reliance on the harmless error doctrine in this case requires the judges of this court to perform a task that the jury may never have addressed because of the refused jury instruction. It requires that the panel resolve matters of credibility and weigh the evidence on the primary issue of guilt or innocence. Mr. Everette has a right to have that issue determined by a jury, not by federal appellate judges. I do not believe that it is the proper role for a federal habeas court to intrude so drastically into the prerogative of the jury. Accordingly, I respectfully dissent.